ELIZABETH A. STRANGE
First Assistant U.S. Attorney
District of Arizona
GARY M. RESTAINO
Arizona State Bar No. 017450
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1200
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: gary.restaino@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

United States of America,

Plaintiff,

vs.

Reginald Fowler,

Defendant.

No. 19-9181MJ

**UNITED STATES' MEMORANDUM IN SUPPORT OF DETENTION**

The United States moves this Court to detain Defendant pending trial because he poses a serious flight risk and presents a risk of continued economic danger.[1] Defendant has been charged with bank fraud, conspiracy to commit bank fraud, operation of an unlicensed money transmitting business, and conspiracy to operate an unlicensed money transmitting business. These crimes all relate to Defendant's alleged involvement in a scheme to operate a shadow bank on behalf of cryptocurrency exchanges in which hundreds of millions of dollars passed through accounts controlled by Defendant in jurisdictions around the world. The United States submits that detention is appropriate for the following reasons: (1) the nature of the instant offense and the strength of the evidence

[1] Assistant United States Attorneys in the charging district (the Southern District of New York) remain in discussions with the defense to see if there are any conditions or combinations of conditions that will reasonably assure the appearance of Defendant. In the event the charging district and the defense can finalize an agreement in advance of the scheduled detention hearing, the government will consent to release while memorializing the agreement on the record.

against Defendant; (2) Defendant's financial resources and ties to other countries; (3) evidence that Defendant has already taken steps to impede this investigation; and (4) evidence of Defendant's involvement in other criminal schemes. For these reasons, among others, Defendant is an atypical white collar defendant and poses a significant flight risk.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. BACKGROUND

On April 11, 2019, Defendant was indicted in the Southern District of New York. The indictment alleged one count of bank fraud, one count of conspiracy to commit bank fraud, one count of operating an unlicensed money transmitting business, and one count of conspiracy to operate an unlicensed money transmitting business. The indictment also includes forfeiture allegations, which list five bank accounts as specific property subject to forfeiture.

On April 30, 2019, Defendant was arrested in Chandler, Arizona.

### II. DEFENDANT IS A SERIOUS RISK FOR NONAPPEARANCE AND SHOULD BE DETAINED

Defendant should be detained absent an agreement by the parties to conditions that would reasonably assure Defendant's appearance at trial. A defendant should be detained when he is a risk for nonappearance at trial and no conditions can reasonably assure his appearance. 18 U.S.C. § 3142(e), (f)(2)(A). A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991). The factors the Court should consider in evaluating pretrial detention are listed in 18 U.S.C. § 3142(g). A consideration of the facts show that Defendant is a significant flight risk given his connections overseas, his financial means to support himself outside the United States, his disregard for this criminal investigation, and his potential involvement in other criminal activity.

#### A. Defendant Faces Significant Punishment

Defendant is facing four counts stemming from his alleged role in operating a shadow bank for cryptocurrency exchanges. This Court is permitted to consider possible

punishment as an incentive for a defendant to flee in assessing a defendant's risk of flight. *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) (defendants deemed to have a greater incentive to consider flight when faced with the possibility of lengthy prison sentences). The bank fraud counts carry a maximum sentence of thirty years. Indeed, recent public reporting, which is corroborated in part through interviews conducted in the course of this investigation, indicates that companies associated with Defendant have failed to return $851 million to a client of Defendant's shadow bank. *See* "The Leading 'Stablecoin' Is No Longer Backed by $1 for Every Coin," *Ars Technica*, Apr. 29, 2019, *available at* https://arstechnica.com/tech-policy/2019/04/how-a-major-cryptocurrency-exchange-lost-control-of-851-million.

**B. The Evidence is Strong Against Defendant.**[2]

As alleged in the indictment, Defendant, along with others, operated a shadow bank for individuals and institutions who wanted to buy and sell cryptocurrency. (Indictment at ¶ 3). This involved opening bank accounts and banks across the world, which would (i) receive deposits in fiat currency from customers who wished to buy cryptocurrency; and (ii) send money to individuals who were exchanging cryptocurrency for fiat currency. (*Id.* ¶¶ 3-6.) The government has interviewed employees at one of the banks Defendant used as part of the scheme. These bank employees will testify at trial that, at the time Defendant opened the bank accounts, Defendant told the employees that the accounts would be used for real estate transactions, despite knowing that the accounts would be used to provide cryptocurrency banking services. Indeed, as the scheme progressed, Defendant and others took deliberate steps to further obscure the true nature of the business from various banks. The government has obtained Defendant's emails, in which Defendant and others discuss inquiries from various banks regarding transactions in Defendant's accounts, and agree to change wire transfer information to conceal the nature of the scheme from these banks.

During this entire period, Defendant failed to register himself or his company as a

[2] The weight of the evidence is generally considered the "least important" factor, *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985), however, it's important here to demonstrate Defendant's motive to flee from the United States to avoid prosecution.

money services business in any domestic jurisdiction, despite the fact that a website associated with this scheme advertised full compliance with all financial licensing requirements. The scheme, however, was not limited to the United States. Defendant set up bank accounts in multiple countries, received and sent money on behalf of clients from around the world, and coordinated the scheme with co-conspirators located in Israel, Switzerland, and Canada.

### C. Defendant Has the Means to Flee.

This scheme involves a staggering amount of money, and the government believes that some of that money remains available to Defendant, especially in overseas jurisdictions. That, combined with Defendant's international ties, would give him the means to flee to avoid prosecution.[3] *See* 18 U.S.C. § 3142(g)(3)(A); *Townsend*, 897 F.2d at 996 (holding that defendants who, *inter alia*, had the ability to travel internationally and could adapt easily to a foreign county, were flight risks); *United States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990) (noting the defendant's foreign contacts as a key factor in its decision to affirm pretrial detention); *United States v. Tooze*, 236 F.R.D. 442, 448 (D. Ariz. 2006) (considering the defendant's trip to Amsterdam earlier that year in denying pretrial release).

First, Defendant has access to millions of dollars in bank accounts around the world. The government, through email search warrants, has obtained a document entitled "Master US Workbook," which details the financial operations of the scheme as of January 2019. This workbook indicates that the scheme had received over $740 million in 2018 alone. It lists approximately sixty different bank accounts, held at both domestic and international banks, with a combined account balance of over $345 million as of January 2019. Notably, this workbook indicates that approximately $50 million is held in domestic accounts, with

---

[3] This is a case where the Defendant has engaged in discussions with the government in advance of charging. (*See generally supra* Section D.) The existence of pre-charging discussions can sometimes help to militate against a risk of flight. Here, however, given the overall evidence against the defendant and given that the full scope of the government's investigation was not made known to the Defendant prior to charging, the fact that Defendant did not flee prior to charging is not an important factor.

the rest located abroad.[4] Assuming these figures remain remotely accurate, Defendant has access to funds on which he could live indefinitely.

Moreover, Defendant has shown a willingness to help himself to these funds in the past. For instance, between in or about June 2018 and in or about July 2018, Defendant sent approximately $60 million from scheme accounts to his personal bank accounts. Beyond the fact of allegedly operating an illegal shadow bank, Defendant appears to have comingled client deposits in his own accounts. This is corroborated by information contained in the Master US Workbook indicating that scheme members set up a "10% Fund" from the client deposits. This fund appears to have been available for Defendant's personal use, and the government does not know the location of those funds. The government has interviewed clients of the shadow bank, none of whom were aware that Defendant would be transfer client funds for his personal use.

In addition to the necessary financial resources, Defendant has overseas ties that would facilitate his flight. He owns businesses in Europe, including Portugal, and has an office in that country. Moreover, his co-defendant, Ravid Yosef, is located in Israel, as are others associated with the scheme. If Defendant chose to flee prosecution, he would have several viable places to which he could relocate.

**D. Defendant Has Shown Disregard for This Investigation**

As noted above, the government seized several of Defendant's bank accounts in October 2018. On or about October 24, 2018, Defendant spoke with FBI agents regarding this seizure. During that conversation, Defendant expressed his desire to cooperate and his willingness to keep the investigation confidential. The following day, the agents sent him a follow-up email. Rather than keep this email confidential, Defendant forwarded it to another scheme member. This was the beginning of a pattern, in which Defendant professed a willingness to assist law enforcement, but ultimately took actions that set back the investigation. This included, among other things, exposing elements of this

---

[4] The government has seized funds held in certain bank accounts associated with both the scheme and Defendant located in the United States.

investigation to co-conspirators without authorization from the FBI. Defendant impeded this investigation at a time when, at least superficially, it appeared that he was cooperative, and at a time when Defendant hoped for a non-criminal resolution of the matter. The government is concerned that he will take more drastic measures now that the government has charged him.

**E. Defendant Appears to Be Involved in Other Unlawful Activity**

Finally, Defendant represents a flight risk and manifest risk of ongoing economic danger to his community because he appears to be involved in additional criminal conduct for which he has not been charged. This includes potential wire fraud relating to the "10% Fund," as noted above. It also includes other fraud schemes that the government has identified in the course of this investigation. For example, Defendant has, on numerous occasions, attempted to obtain bank loans by presenting fraudulent bond certificates worth billions of dollars. During a search of Defendant's offices that occurred at the time of his arrest, FBI agents found documents indicating that Defendant was attempting to use scheme funds for the same purpose—namely, to use these funds as collateral for loans from banks.[5]

FBI agents also recovered approximately $14,000 in counterfeit currency at Defendant's office. The counterfeit currency consisted of sheets of $100 bills that were found in a filing cabinet in an office. A Special Agent for the United States Secret Service, after examining the sheets, determined that they were undergoing a process common in counterfeiting schemes to turn paper bills into passable currency. In fact, the FBI also recovered black carbon paper from the office, which is often used as part of this process for making believable counterfeit bills.

/ / /

/ / /

---

[5] To the extent the parties cannot reach an agreement on conditions and the hearing proceeds with testimony, the government will move to unseal, and will produce, the affidavit in support of the search warrant.

Thus, it may be that this case is only one of multiple criminal and legal proceedings facing Defendant.[6]

## III. CONCLUSION

Defendant is a serious flight risk and danger to the community because he has access to hundreds of millions of dollars in foreign bank accounts, has shown little respect for the criminal justice process, and appears to be involved in numerous fraudulent schemes beyond the charged conduct. Absent an agreement by the parties to a package of conditions, there are no conditions or combination of conditions to reasonably assure the appearance of the Defendant as required. Defendant should be detained.

Respectfully submitted this 1st day of May, 2019.

ELIZABETH A. STRANGE
First Assistant U.S. Attorney
District of Arizona

*s/Gary Restaino*
GARY M. RESTAINO
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to CM/ECF registrant: Gerald Williams

[6] Defendant also appears to have numerous legal issues involving other business ventures. For example, it is reported that Defendant was a primary backer of the Alliance of American Football, but pulled his investment shortly after the season began. "AAF Goes Under: Inside the Sudden Collapse of the Alliance of American Football," *The Orange County Register*, Apr. 5, 2019, *available at* https://www.ocregister.com/2019/04/05/aaf-goes-under-inside-the-sudden-collapse-of-the-alliance-of-american-football.